2020 IL App (1st) 170491

Opinion filed November 4, 2020

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 17598 |
| | ) | |
| WILLIAM A. ROUSE II, | ) | Honorable |
| | ) | James N. Karahalios, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant William A. Rouse II appeals the trial court's order granting the State's motion to dismiss his *pro se* postconviction petition for relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). He contends that (1) he made a substantial showing that his trial counsel was ineffective for misadvising him on the minimum sentence for a lesser-included offense, causing him to reject a jury instruction on the lesser-included offense, and (2) he did not knowingly waive his right to postconviction counsel. For the following reasons, we affirm.

¶ 2 Following a 2011 jury trial, defendant was convicted of three counts of aggravated criminal sexual assault (ACSA) and sentenced to three consecutive terms of 6 years' imprisonment, for a total sentence of 18 years. We set forth the facts in defendant's direct appeal (*People v. Rouse*, 2014 IL App (1st) 111302-U), and we recite them here to the extent necessary to our disposition.

¶ 3 Defendant was charged with three counts of ACSA for using force or threat of force to penetrate the victim, G.K., vaginally, anally, and orally and acting in such a manner as to threaten or endanger her life. He was represented by private counsel, James P. Casement and Gregory Reed. At trial, G.K. testified that she worked with defendant's wife, Kelly Rouse, and socialized at defendant's house in the past. On September 10, 2010, G.K. was at defendant's house after work and planned to spend the night. G.K. had a glass of wine before dinner and another with her meal. She acknowledged that she had been prescribed Adderall, Zoloft, trazodone, and clonazepam and knew she was not supposed to drink while on her medication. Nevertheless, G.K. took her Adderall dosage at defendant's house. Defendant's friend Joseph Perez was also there for part of the time.

¶ 4 After Kelly went to bed and Perez left, defendant and G.K. watched television on the couch. Defendant grabbed G.K.'s hair, pushed her head down, and rubbed his penis on her face. Defendant's penis went into G.K.'s mouth multiple times, causing her to gag and choke. Although G.K. attempted to get away from defendant, he bent her over the couch with her face pushed into the cushions. G.K. stopped struggling after defendant threatened to "break [her] f*** neck." He pulled G.K.'s pants down and touched the tip of his penis to her vagina and anus. Defendant inserted his penis into her vagina after she covered her anus with her hands.

¶ 5 G.K. was able to escape after approximately 20 minutes and fled into the garage where she grabbed a pipe. She ran to a busy street and fell to the ground where a man, Anthony DiCaro, approached her. After she told DiCaro what happened, he called the police. G.K. acknowledged

she was "freaked out" when paramedics arrived and had to be strapped down. She remained frightened because she believed she could hear defendant's voice. Upon presenting at the hospital, G.K. told a nurse about the attack by defendant. She did not remember telling any emergency personnel that she was "unsure" about whether defendant had penetrated her.

¶ 6    DiCaro corroborated G.K.'s version of events. He observed her on the sidewalk at approximately 5 a.m. on the corner of Devon Avenue and Arlington Heights Road when he was driving home from work. G.K.'s shirt was ripped, her pants were unzipped and unbuttoned, and she was not wearing socks or shoes or carrying a purse. G.K. was crying and holding a metal pipe. She told him that her friend's husband attacked her while they watched television and her friend was asleep. G.K. did not state she had been partying or drinking, and she did not appear to have been drinking or doing drugs. DiCaro did not notice any odor of alcohol. He told police what G.K. told him about the attack.

¶ 7    Dr. John Ortinau treated G.K. in the emergency room on September 11, 2010. She was visibly upset and reported that she had been sexually assaulted. G.K. relayed that a man forced his penis into her mouth and attempted to penetrate her vagina and anus. The man pushed her face into couch cushions, and her vagina and neck were sore. G.K. was certain that the man forced his penis into her mouth; however, she was unsure whether the man penetrated her vagina and anus due to how quickly the attack had taken place.

¶ 8    Dr. Ortinau observed bruising on G.K.'s upper arms and forearms and redness on her neck and knees. She did not have visible trauma to her vagina or anus, which was not uncommon in sexual assault cases where the victim was not a virgin and where no foreign objects were used for penetration. G.K. reported she was on various prescription drugs, but Dr. Ortinau did not order toxicology tests. He did not note that G.K. appeared intoxicated, which was normal practice if a

patient appeared impaired. Dr. Ortinau did not notice anything unusual about G.K.'s pupils. Her pulse rate was elevated, which was not unusual in a patient who had been sexually assaulted. He acknowledged that an elevated heart rate would also be expected in a patient on methamphetamines.

¶ 9     Elk Grove Village police officer John Suarez testified that he responded to G.K.'s and DiCaro's location on September 11, 2010. G.K. was "crying, hyperventilating, and repeating that she was attacked." Her hair was messy, and her clothes were disheveled. Suarez then went to defendant's residence, where he met Kelly and defendant, who was sitting on a couch in the living room wearing jeans but no shoes, socks, or shirt. Defendant acknowledged that G.K. had been there and that they had been drinking alcohol, but he did not know that G.K. had left the house. Defendant was "perfectly willing to cooperate" with the police, but Suarez did not believe that defendant was being truthful.

¶ 10    Suarez completed a police report in this case but did not include his observations that G.K. was crying and hysterical or that her hair and clothing appeared to be in disarray. Suarez included in the report that G.K. admitted to drinking alcohol, her eyes were glassy, and she smelled of alcohol; however, he did not include defendant's admission that he had been drinking also.

¶ 11    Elk Grove police officer Brian Vivona testified that he photographed G.K. while she was in the hospital. Vivona then went to defendant's residence to take photographs of the crime scene. Kelly and defendant's mother-in-law were present at that time. Vivona denied manipulating anything before taking photographs.

¶ 12    Kelly Rouse testified for the defense that G.K. was intoxicated every time they socialized outside of work. They both snorted Adderall on several occasions, including the night in question, when they each snorted four capsules. They also were drinking wine that night.

¶ 13    Dr. Alan Jaffe, a licensed clinical psychologist who did not treat G.K., testified that a person who ingested 120 milligrams or more of Adderall would have an increased heart rate. Those who ingest Adderall while drinking alcohol would likely experience disorientation and have difficulty engaging in rational thinking and could experience auditory, visual, and olfactory hallucinations. He acknowledged he did not know whether G.K. was on Adderall at the time of the attack and conceded her medical records gave no indication that she was delusional or hallucinating when she presented at the hospital. He viewed photographs of G.K. and stated her pupils appeared to be dilated, which is expected in a person who has ingested methamphetamine.

¶ 14    Perez testified that on September 10, 2010, he observed Kelly and G.K. snorting Adderall and drinking what he estimated was an entire box of wine while he was present. He acknowledged that he was also snorting Adderall and drinking vodka but denied being intoxicated. Perez left defendant's residence around 1 a.m. on September 11, 2010, and received a call from G.K. at some point after. He believed G.K. was intoxicated because she was slurring her words and could not hold a coherent conversation.

¶ 15    Perez received a call to report to the Elk Grove Village police station at around 6 a.m. He told Detective George Winkler that he saw G.K. drink wine and believed she was intoxicated. He did not mention that Kelly and G.K. snorted Adderall because the Rouses had a baby and he did not want to cause an investigation by the Illinois Department of Children and Family Services.

¶ 16    Officer James Chmelik spoke to G.K. on September 11, 2010, at the intersection of Devon Avenue and Arlington Heights Road. G.K. was crying and barefoot, and her hair was disheveled. He noticed that she smelled of alcohol and appeared intoxicated. G.K. reported that she had consumed four to six drinks at Kelly's house and that defendant attacked her as they sat on a couch. She explained that defendant rubbed his arm and shoulder against her and then forced her head

towards his groin and inserted his penis into her mouth. Defendant pushed her against the couch, pulled her pants down, and attempted to insert his penis into her anus. He was unable to do so and then inserted his penis into her vagina. G.K. did not mention using drugs that evening.

¶ 17    Registered nurse Lisa Romanski treated G.K. when she arrived in the emergency room. G.K. was alert and able to communicate but was tearful and spoke in a low voice. She did not seem to be delusional or experiencing hallucinations, but Romanski noted that her pupils appeared to be dilated and that her hair was tangled. Romanski observed redness on G.K.'s knees and a bruise on her left arm. G.K. reported defendant forced his penis into her mouth, anus, and vagina. Romanski thereafter drew blood from G.K. and completed a rape kit.

¶ 18    Detective George Winkler interviewed G.K. in the emergency room. She reported that she had consumed four to six glasses of wine the previous night. G.K., Kelly, and Perez did not mention using drugs during their various interviews. Winkler confirmed that he interviewed defendant prior to his arrest. Defendant was approximately 6 feet tall and weighed approximately 205 to 210 pounds. Winkler did not observe any marks or signs of bruising on defendant's body at that time.

¶ 19    Elk Grove Village paramedics John Lodewyk and Matthew Bonilla attended to G.K. on September 11, 2010. Lodewyk did not remember whether G.K. had appeared intoxicated at the time, but he remembered that she was not wearing shoes. Bonilla remembered that G.K. smelled of alcohol and was difficult to get into the ambulance because she was upset and afraid.

¶ 20    Jolie McGrath, who worked with G.K., testified that she socialized with G.K. outside of work and G.K. would "get pretty drunk." McGrath had witnessed G.K. hungover 10 to 15 times over the course of two years. She also observed G.K. come to work intoxicated twice.

¶ 21   The parties stipulated that the vaginal swabs taken from G.K. during the rape kit did not contain a sufficient amount of DNA for analysis.

¶ 22   During the jury instruction conference, the following colloquy took place:

"THE COURT: All right. Gentlemen, in reviewing these and thinking about the case, which is my job, from the evidence it could be argued that the acts of the defendant were attempted and not completed. So I will offer the attempt, actual attempt of these acts as a lesser included. What would you like the court to do?

[DEFENSE COUNSEL CASEMENT]: Your Honor, at this time we would not want the lesser included in the jury instructions.

THE COURT: So you're asking the court not to give the attempt instruction?

[CASEMENT]: That is correct.

THE COURT: As to each of these acts?

[CASEMENT]: As to each of these acts.

THE COURT: Is that correct, [defense counsel] Reed?

[DEFENSE COUNSEL REED]: Yes, your Honor.

THE COURT: Is this based on your strategy in the case?

[CASEMENT]: That is correct.

THE COURT: You have to answer.

[REED]: Yes, your Honor.

THE COURT: [Defendant], do you agree with that strategy of your lawyers?

[DEFENDANT]: I do, your Honor."

¶ 23    The jury then found defendant guilty of all three counts of ACSA. The court sentenced defendant to 3 consecutive sentences of 6 years, for a total sentence of 18 years' imprisonment.

¶ 24    On direct appeal, we affirmed defendant's convictions, finding the evidence sufficient to prove him guilty beyond a reasonable doubt of ACSA and finding he was not denied effective assistance of counsel at trial. *Rouse*, 2014 IL App (1st) 111302-U, ¶¶ 38, 40-50.

¶ 25    On March 6, 2015, defendant filed a *pro se* petition for relief under the Act raising multiple claims. Relevant here, defendant argued he received ineffective assistance from trial counsel when they provided erroneous advice regarding the sentencing range of the lesser-included offense of attempted ACSA. Defendant argued that his trial attorneys informed him that the sentences for three counts of attempted ACSA would run consecutively and, therefore, defendant would face a sentencing range of 12 to 45 years if convicted of three counts of attempted ACSA. Defendant stated counsel advised him not to accept a jury instruction on attempted ACSA because the State "had not even come close to proving their case beyond a reasonable doubt, and that including a lesser included would possibly give the jury a reason to come up with a compromised verdict." He claimed his attorneys never discussed with him the possibility that the three sentences for attempt would run concurrently, for a sentencing range of 4 to 15 years. Ultimately, defendant decided not to instruct the jury on attempted ASCA. He acknowledged that the court informed him it was his choice whether to include the attempt instructions. Defendant contended his decision to reject the attempt instruction was based on counsel's "grossly inaccurate advice," which constituted deficient performance. He claimed he was prejudiced because, had he been correctly informed of the 4- to 15-year sentencing range, he would have opted to have the jury instructed on attempted ACSA.

¶ 26    In support of his petition, defendant attached, in relevant part, affidavits from his trial attorneys Casement and Reed and his own affidavit.

¶ 27    Casement averred to the following. During jury instructions, the trial court stated "attempt criminal sexual assault was appropriate for this case." Casement and Reed advised defendant that the sentencing range for each attempted CSA would be 4 to 15 years but would be served consecutively, for a total sentence of 12 to 45 years, if convicted of all three counts. "The decision to accept a lesser included was [defendant's]," but Casement advised defendant against instructing the jury on attempted ACSA because he believed the State did not meet its burden of proof and "including a lesser included would possibly give the jury a reason to come up with a compromise verdict." Defendant approved that strategy, reasoning there was little difference between a 12- or 18-year minimum sentence. There was no discussion of the sentences for the attempt counts running concurrently. Reed's affidavit was nearly verbatim to Casement's.

¶ 28    In his own affidavit, defendant averred Reed and Casement informed him he would likely face a sentence in the "lower end of the sentencing range" due to his lack of criminal history. Prior to the jury instruction conference, his attorneys never discussed with him the possibility that he would receive a sentence of less than 18 years. Counsel advised him that each of the three charges of ACSA was a Class X felony with a range of 6 to 30 years' imprisonment that he would serve consecutively for a total of 18 to 90 years, if convicted. During the jury instruction conference, the court informed defendant that "attempted criminal sexual assault was appropriate for this case." Counsel told defendant that each count of attempted ACSA carried a 4- to 15-year sentencing range, which would also run consecutively for a sentencing range of 12 to 45 years if convicted on all three counts. Counsel advised against instructing the jury on attempt because the State had not

proved their case beyond a reasonable doubt and instructing the jury on a lesser offense would encourage the jury to reach a compromised verdict.

¶ 29 Defendant further averred that he "approved" counsel's strategy and made the decision not to instruct the jury on attempted ACSA, reasoning

"There was no difference between minimum sentences of 12 or 18 years, life as I knew it would be over. My career would be lost to me, I would miss my children grow up, and my wife would not stick around if sentenced to such a lengthy amount of time."

There was no discussion that the sentences on the attempted ACSA counts would run concurrently. Had he been properly advised that the attempt offenses would run concurrently for a sentencing range of 4 to 15 years, "given the significant disparity in sentencing ranges," defendant would have "accepted the terms and instructed defense counsel to submit those jury instructions."

¶ 30 On June 19, 2015, the court docketed the petition for second-stage proceedings, finding "[i]t appears the defendant does allege matters of constitutional import." The court appointed the Office of the Public Defender to represent defendant.

¶ 31 On February 26, 2016, a public defender not representing defendant appeared and informed the court that postconviction counsel was "still investigating the claims that are in the post conviction."

¶ 32 On May 13, 2016, postconviction counsel filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013). In her certificate, postconviction counsel stated that she (1) consulted with defendant by mail to ascertain his contentions of deprivations of his constitutional rights; (2) examined the petition and consulted with defendant about claims raised in the petition and issues he raised in correspondences; (3) examined Casement's and Reed's trial file, including police reports, forensic reports, photographs entered into evidence at trial, and

G.K.'s hospital records; (4) obtained and examined the report of proceedings and common-law records for defendant's direct appeal as well as the file maintained by the clerk of the circuit court; (5) examined crime scene photographs but did not view supplemental volumes of photographs or photographs of G.K.'s injuries entered into evidence in the appellate record because defendant's argument on direct appeal that the evidence was insufficient to convict him was rejected; (6) examined this court's order filed pursuant to Illinois Supreme Court Rule 23(b) (eff. July 1, 2011) on defendant's direct appeal (*Rouse*, 2014 IL App (1st) 111302-U), the State's motion for leave to supplement the record on appeal, and the briefs submitted on direct appeal; (7) examined defendant's *pro se* petition and concluded it adequately presented his claims of deprivations of constitutional rights and "there is nothing that can be added by and [*sic*] amended or a supplemental petition"; and (8) examined "the record of proceedings at the jury trial, and have not made any amendments to the petitions [*sic*] filed *pro se* because his *pro se* petition made an adequate presentation of [defendant's] claims."

¶ 33    On August 26, 2016, the State filed a motion to dismiss defendant's petition.

¶ 34    On September 27, 2016, defendant sent a *pro se* letter to the trial court, requesting to "dismiss court appointed counsel and proceed *pro se*." In his letter, defendant detailed that he decided to represent himself following "correspondence" between himself and postconviction counsel. He stated that, in a letter dated August 31, 2015, postconviction counsel stated, "From my experience, Judge Fecarotta does not allow court appointed counsel to withdraw even if they argue that the *pro se* petition lacks an arguable basis in law and fact. I disagree since I do believe that parties have a constitutional right to represent themselves." Defendant's letter further detailed that in a letter dated May 11, 2016, postconviction counsel stated,

"I will not amend or supplement your *pro se* petition. A post-conviction attorney can stand on the petition, or withdraw as counsel if the pleadings are frivolous. *** The problem is that the jury found you guilty of 3 counts of the class x [*sic*] [ACSA]; consequently, you cannot establish any prejudice since there was sufficient evidence for the jury to find you guilty of the class x [*sic*] felony. *** You have the option to represent yourself if you disagree with my analysis."

¶ 35 In his letter, defendant further stated that "[t]he decision by [postconviction counsel] not to amend the petition is one that appears to be consistent with her beliefs as well as the law." Defendant, however, was concerned that she "reached this decision prior to receiving the State's motion to dismiss." Defendant complained that postconviction counsel failed to confer with him "to see if it was possible to 'shore up' the argument for prejudice." Finally, he quoted an August 26, 2016, letter from postconviction counsel, which he alleged stated, "there is only a remote possibility that the current sitting judge will grant us an evidentiary hearing." Defendant believed that statement was "much more optimistic" than her earlier statements that he could not show prejudice. Because there was a possibility of an evidentiary hearing, defendant stated that his petition was not frivolous. Defendant concluded that he disagreed with postconviction counsel's assessment of his case but stated, "as a lay person, [he] [was] in way over his head and ha[d] concerns about procedural defaults as well as how this decision could affect his ability to appeal an unfavorable decision." Defendant "reluctantly" requested that the court "relieve" court-appointed counsel and allow him leave to represent himself, "as he feels he has no other choice."

¶ 36 On November 18, 2016, postconviction counsel appeared before the court. She noted that she "believe[d] [she] discharged 651(c) duties" and did not act unreasonably.

¶ 37 On February 17, 2017, the court held a hearing on defendant's "petition to proceed *pro se*." The court first inquired whether postconviction counsel had prepared a response to the State's motion to dismiss. Postconviction counsel stated, "No, your Honor. I elected not to prepare a written response and would be prepared to—I was prepared to answer orally, and so, that was a legitimate constitutionally permissible strategy." The following then occurred on the record:

"THE COURT: Now, [defendant], if I allow you to fire your lawyer and proceed to represent yourself, the next step in this is that you would have to file a response to the State's motion to dismiss the petition.

So if you want to undertake that, we'll proceed with a hearing on your being allowed to do that. If you want the public defender to continue to represent you insofar as at least handling this motion to dismiss, we can do that as well. Do you want to talk to the public defender for a moment so that you fully grasp the situation?

[DEFENDANT]: I would appreciate that, your Honor."

¶ 38 The court passed the case, and defendant spoke off the record with postconviction counsel. When the court recalled the case, defendant told the court, "At this time I wish to proceed *pro se*, your Honor." He also informed the court that he had prepared a response to the State's motion to dismiss and was ready to both file his response and argue it. Prior to addressing the motion to dismiss, the court admonished defendant:

"THE COURT: [T]he Illinois Supreme Court has passed a rule that is required to be read to you before you proceed to represent yourself, okay, and it's called Supreme Court Rule 401. Now, I'm going to read it to you slowly. If there's anything you don't understand, you'll let me know and I'll explain it; okay?

[DEFENDANT]: Yes.

THE COURT: All right. Any waiver of counsel shall be in open court. We're in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment—you are imprisoned—without first, by addressing the defendant personally—and I'm talking to you personally—in open court and informing him of and determining that he understands the following:

Number 1, which is the nature of the charge. In this case, you are already convicted of aggravated criminal sexual assault, and you are serving a sentence. The nature of the matter which is pending is whether or not you can get relief from that conviction and sentence during these proceedings, and that's why it's called a postconviction petition. So do you understand that?

[DEFENDANT]: Yes, your Honor.

THE COURT: All right. And you understand that if you're not successful in getting relief, then the sentence—the conviction and sentence that you already have will remain as it is. Do you understand that?

THE COURT: All right. What is it that you're sentenced to, how much?

[DEFENDANT]: 18 years at 85 percent, [6] years per count.

THE COURT: Okay. So, then you understand the amount of time that's at stake here in this proceeding?

[DEFENDANT]: Yes, your Honor.

THE COURT: Okay. Next, that you have a right to have counsel, and if you are indigent—meaning you don't have any money to afford counsel—that counsel will be appointed for you by the Court. And that's already been determined, because you're in

prison you don't have any money. And counsel, the Public Defender's Office, has already been appointed for you.

So it's important for you to understand that you have a free lawyer in the Public Defender, and if you want, that lawyer will continue to represent you for free if that's what you want. Do you understand that?

[DEFENDANT]: Yes, your Honor.

THE COURT: All right. Now, the part that is not in *** the rule which I usually add is this: As you already know, these are legal proceedings that deal with rules of law that have certain requirements and technicalities. You understand that?

[DEFENDANT]: Yes, your Honor.

THE COURT: All right. You're going to be facing—instead of your lawyer, you're going to be facing an opponent, the State's Attorney's Office, who has lawyers that are skilled in postconviction proceedings just like this. And, obviously—and I know that you know this, so I'm not talking down to you but I want to make sure that the record is clear and that you understand everything completely.

These lawyers have gone to law school, they've received an education, they've passed an examination, a bar examination, in order to practice, which shows, again, proficiency, and then they've had years and years of experience in handling these kinds of cases. So the bottom line is that you're going to be going up against someone who is skilled. You're not going to be going up against a fellow inmate who is also not a lawyer. You're not a lawyer; you're going to be facing a lawyer. That, to me, is not a wise idea. But it's your decision; it's not mine. I can only tell you what I think.

The second thing is that I can't change the rules for you because you're not a lawyer. In other words, the rules are the rules, and both sides have to comply with those rules. They already know what the rules are. All right? I can't say to you, you know what; you didn't comply with the rule, but you're not a lawyer, so it's okay, I'll overlook it. I'm not allowed to do that.

The analogy that I end up telling everybody is this: If you had appendicitis, would you operate on yourself or would you go to a surgeon? Okay? You need a surgeon. That's my opinion. I wouldn't operate on myself. But the choice is 100 percent yours. There is no pressure from me either way, and there can't be pressure from anybody. So you can do whatever it is that you want to do.

Now, having advised you of all of that, are you ready to make a decision as to whether or not you want to go ahead and represent yourself and not have a lawyer do it for you?

[DEFENDANT]: I feel, your Honor, that I've been presented with an either/or proposition where I have no choice but to proceed *pro se*.

THE COURT: I don't understand what that means. I haven't given you an either/or, have I?

[DEFENDANT]: No, your Honor. In my correspondence with [postconviction counsel], she stated that she would not be pursuing a response to the State's motion to dismiss and that I could either accept her conclusion or proceed *pro se*.

THE COURT: Okay.

[DEFENDANT]: Now, I have no intentions of sitting by idly allowing my petition to be dismissed without response, your Honor.

THE COURT: Okay. I understand now.

[POSTCONVICTION COUNSEL]: In response, your Honor—

THE COURT: No, no. There's no response necessary. Just give me a minute.

* * *

Let the record show there has been a hearing on the defendant's motion to proceed *pro se*. Supreme Court Rule 401(a) has been read and discussed. The defendant is admonished about that and knows and understands it.

The defendant persists in his demand to proceed *pro se*, and, therefore, the defendant's motion to proceed *pro se* is granted. The public defender is withdrawn."

¶ 39    The matter proceeded to a hearing on the State's motion to dismiss. Defendant reiterated that he prepared a written *pro se* response and that he was ready to argue the motion. The State argued that the claims defendant asserted were largely matters that had been raised and litigated on direct appeal. With respect to the claim regarding the attempted ACSA instruction, the State argued the facts did not support an attempt instruction, that issue should have been raised on direct appeal, and this court found on direct appeal that there was no evidence to show G.K. was uncertain about her attack.

¶ 40    Defendant read his response in court and abandoned all of his claims except the ineffective assistance claim relating to counsel's advice regarding the sentence of attempted ACSA and defendant's resulting decision to forgo the attempt instruction. Defendant argued that his ineffective assistance claim was "entirely dependent" on his trial attorneys' affidavits, which were matters outside of the appellate record and therefore could not have been raised on direct appeal. With respect to prejudice, defendant argued G.K.'s testimony regarding sexual penetration was

inconsistent and, had the jury been instructed on attempted ACSA, there was a reasonable probability that it would have found him guilty of the lesser-included offense of attempt.

¶ 41 Defendant acknowledged to the court that his attorneys discussed with him whether attempt instructions should be submitted to the jury. He confirmed that the trial court ruled that the attempt instructions, if requested, would have been submitted to the jury. Finally, defendant acknowledged that he declined to ask for jury instructions on attempt. He clarified that the attempt counts did not carry mandatory consecutive sentences and therefore could have been served concurrently. The trial court responded,

> "But it's not mandatory to be concurrent. It's discretionary with the court as to whether or not to impose consecutive or concurrent sentencing where either one is available to the judge.

> * * *

> So, by advising you of the worst-case scenario, which is consecutive sentences, I do not find that the advice of the attorneys or discussion by the attorneys is incompetent representation.

> I also find that while I understood everything that you've said about the inconsistencies, which you've detailed marvelously, number one, the jury was the finder of fact, and they bought it beyond a reasonable doubt."

¶ 42 The court additionally found that "[a]ll of this was discussed on appeal and ruled upon." The court granted the State's motion to dismiss.

¶ 43 On appeal, defendant contends the trial court erroneously dismissed his petition because he made a substantial showing that trial counsel was ineffective for incorrectly advising him that sentences for attempted ACSA must be served consecutively for a minimum sentence of 12 years,

rather than concurrently for a minimum sentence of 4 years, causing him to decline to instruct the jury on the lesser-included offense of attempted ACSA. We note that during oral arguments before this court, defendant's counsel in this appeal did not address defendant's sentencing claim, but rather presented argument solely on the issue of whether defendant voluntarily waived his postconviction counsel.

¶ 44    The Act provides for a three-stage process by which a defendant may assert his conviction was the result of a substantial denial of his constitutional rights. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008). At the first stage, the trial court must review the postconviction petition and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2014). If the petition is not dismissed within 90 days at the first stage, counsel is appointed, and it advances to the second stage. *Id.* § 122-2.1(a), (b).

¶ 45    This case involves the second stage of postconviction proceedings. At the second stage, the dismissal of a petition is warranted only when the allegations in the petition, liberally construed in light of the original trial record, fail to make a substantial showing of a constitutional violation. *People v. Hall*, 217 Ill. 2d 324, 334 (2005). At this stage, the trial court is "concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity which would necessitate relief under the Act" (*People v. Coleman*, 183 Ill. 2d 366, 380 (1998)), and "all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true" (*People v. Pendleton*, 223 Ill. 2d 458, 473 (2006)). The defendant "bears the burden of making a substantial showing of a constitutional violation." *Id.* We review the trial court's dismissal of defendant's postconviction petition without an evidentiary hearing *de novo*. *Id.*

¶ 46    To determine whether defendant was denied his right to effective assistance of counsel, we apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v.*

*Enis*, 194 Ill. 2d 361, 376 (2000). Defendant must show, first, that "counsel's representation fell below an objective standard of reasonableness" (*Strickland*, 466 U.S. at 687-88) and, second, that he was prejudiced such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Enis*, 194 Ill. 2d at 376. To prevail on a claim of ineffective assistance, a defendant must satisfy both prongs of the *Strickland* test. *Id.* at 377. Thus, we may proceed directly to the prejudice prong. *Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

¶ 47 Defendant claims that counsel was ineffective for improperly advising him that any attempted ACSA convictions would result in consecutive, rather than concurrent, sentences, thereby causing him to elect not to instruct the jury on attempted ACSA.

¶ 48 In this case, we find defendant failed to make a substantial showing of ineffective assistance of counsel, as defendant has not substantially shown that he was prejudiced by counsel's advice regarding the minimum sentence for the offense of attempted ACSA, in light of the large amount of evidence against him. See *People v. Hale*, 2013 IL 113140, ¶ 17 (stating that a reviewing court "may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance").

¶ 49 As charged in this case, a person commits the offense of aggravated criminal sexual assault when he commits an act of sexual penetration upon the victim by use of force or threat of force

and acts in such a manner as to threaten or endanger the life of the victim. 720 ILCS 5/12-14(a)(3) (West 2010). " 'Sexual penetration' " is defined as:

> "any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person *** into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." *Id.* § 12-12(f).

Thus, for purposes of this case, to prove penetration, the State only needed to prove that defendant made contact, "however slight," with G.K.'s genitals or mouth using defendant's penis. See *id.*

¶ 50    Here, taking as true defendant's allegation that he would have elected to have the jury instructed on attempt had he been informed that the sentences for attempted ACSA could have been concurrent, as we must at this stage (*Pendleton*, 223 Ill. 2d at 473), we cannot say that there was a reasonable probability that the result of the proceeding would have been different had that instruction been given. Attempt is a lesser included offense of ACSA. See 720 ILCS 5/2-9(b) (West 2010) (" 'Included offense' means an offense which" "[c]onsists of an attempt to commit the offense charged or an offense included therein.") " 'A defendant is entitled to a lesser included offense instruction only if the evidence would permit a jury rationally to find the defendant guilty of the lesser included offense and acquit him or her of the greater offense.' " *People v. Parsons*, 284 Ill. App. 3d 1049, 1060 (1996) (quoting *People v. Novak*, 163 Ill. 2d 93, 107-08 (1994)).

¶ 51    The evidence at trial established that defendant forced his penis into G.K.'s mouth and then bent her over the couch and touched his penis to her anus and vagina before forcing his penis into her vagina while shoving her face into couch cushions and threatening to break her neck. Although

defendant complains that G.K.'s testimony was not credible due to her consumption of alcohol and Adderall, as we noted on direct appeal, G.K.'s accounts of the attack to the various individuals who assisted and treated her afterward were consistent, and the jury knew of her use of Adderall and alcohol and still evidently deemed her credible. *Rouse*, 2014 IL App (1st) 111302-U, ¶ 38. Thus, the evidence uncontrovertibly showed contact, however slight, between defendant's penis and G.K.'s mouth, vagina, and anus and would not permit a jury to reasonably acquit defendant of the greater ACSA offense. See *People v. Stewart*, 406 Ill. App. 3d 518, 539 (2010) (finding the defendant was not prejudiced by the failure to instruct the jury on the lesser-included offense because the evidence supporting the defendant's greater offense was so strong); *Parsons*, 284 Ill. App. 3d at 1060-61 (same); *People v. McClellan*, 232 Ill. App. 3d 990, 1008 (1992) (failure to instruct jury on lesser offense requires reversal only if the defendant was so prejudiced by such failure so as to affect the outcome of the verdict).

¶ 52 Moreover, defendant has not shown that the evidence at trial would have permitted a finding of attempted ACSA to begin with. As we have stated, the State only needed to prove that defendant made contact, "however slight," with G.K.'s genitals or mouth using defendant's penis. See 720 ILCS 5/12-12(f) (West 2010). Thus, the evidence that defendant inserted his penis into G.K.'s mouth, touched G.K.'s vagina and anus with his penis, and inserted his penis into G.K.'s vagina all constituted acts of "sexual penetration." There was no evidence at trial that would have supported a finding that defendant attempted, but failed, to make any contact at all with G.K.'s genitals or mouth using defendant's penis. Because defendant failed to demonstrate prejudice, we need not determine whether counsel's performance was deficient. See *Strickland*, 466 U.S. at 697.

¶ 53 Defendant next contends that he did not voluntarily waive his right to postconviction counsel. He argues that he repeatedly stated he had no choice but to proceed *pro se* because

postconviction counsel refused to present his claims and that the trial court erred by failing to inquire into his allegations to ensure his waiver of counsel was knowing and voluntary.

¶ 54    Defendants in postconviction proceedings do not have a constitutional right to counsel. *People v. Lesley*, 2018 IL 122100, ¶ 35. Rather, "[t]he right to assistance of counsel in postconviction proceedings is a matter of legislative grace, and a defendant is guaranteed only the level of assistance provided by the Post-Conviction Hearing Act." *People v. Hardin*, 217 Ill. 2d 289, 299 (2005). Postconviction counsel is required to provide defendant with a " 'reasonable level of assistance.' " *People v. Lander*, 215 Ill. 2d 577, 583-84 (2005) (quoting *People v. Owens*, 139 Ill. 2d 351, 364 (1990)). Under the Act, indigent defendants are afforded the right to counsel beyond the first stage of proceedings. 725 ILCS 5/122-4 (West 2014). "In fact, it has been determined that the Act cannot perform its function unless the attorney appointed to represent an indigent petitioner ascertains the basis of his complaints, shapes those complaints into appropriate legal form, and presents them to the court." *Lesley*, 2018 IL 122100, ¶ 33 (citing *People v. Suarez*, 224 Ill. 2d 37, 46 (2007)).

¶ 55    Although the Act provides that the trial court must appoint counsel for a defendant who so requests and lacks the means to procure counsel, an indigent defendant is not entitled to representation by the counsel of his choice. *People v. Gray*, 2013 IL App (1st) 101064, ¶ 22; *People v. French*, 210 Ill. App. 3d 681, 690 (1991). Further, a defendant has a right to proceed *pro se* in postconviction proceedings. *Lesley*, 2018 IL 122100, ¶ 34. If a defendant wishes to proceed *pro se*, he must knowingly and intelligently waive his right to counsel, *i.e.*, the waiver must be clear and unequivocal. *Id.*; *Gray*, 2013 IL App (1st) 101064, ¶ 23. In determining whether a defendant's waiver is clear and unequivocal, a court must "determine whether the defendant truly desires to represent himself and has definitively invoked his right of self-representation." *Gray*,

2013 IL App (1st) 101064, ¶ 23. Whether there has been a knowing and intelligent waiver of the right to counsel depends upon the particular facts and circumstances of the case, including the background, experience, and conduct of the defendant. *Lesley*, 2018 IL 122100, ¶ 51. We look to the entire record to determine whether the waiver of counsel was knowingly and understandingly made. *Id.* We review the trial court's determination regarding whether there has been a knowing and intelligent waiver of counsel for an abuse of discretion. *Gray*, 2013 IL App (1st) 101064, ¶ 23.

¶ 56    We initially note that, before defendant sought to proceed *pro se* in the postconviction proceedings, defendant's postconviction counsel had filed a Rule 651(c) certificate. The certificate reflected that she had consulted with defendant regarding his claims and that she had examined defendant's postconviction petition, the evidence at trial, and this court's order on defendant's direct appeal, among other things. Counsel concluded in her certificate that defendant's *pro se* postconviction petition adequately presented defendant's claims so that no amendments were necessary. Defendant's counsel was prepared to orally argue the State's motion but was fired by defendant before doing so. Therefore, despite defendant's assertion that his postconviction counsel refused to present his claims, the record suggests counsel was in fact prepared to argue defendant's claims in the second-stage postconviction hearing.

¶ 57    The record in this case demonstrates that defendant knowingly and intelligently waived his right to postconviction counsel. Defendant, after conferring with counsel via correspondence, wrote to the trial court requesting to proceed *pro se* and detailing his concerns with counsel's handling of his case. Defendant acknowledged that counsel's decision not to amend his petition "appears to be consistent with her beliefs as well as the law" but was concerned that she did not wait to reach her decision until after receiving the State's motion to dismiss. The court allowed defendant time in court to confer with counsel prior to addressing whether to allow him to proceed

*pro se*, and defendant again stated he wished to represent himself. The court subsequently admonished defendant extensively regarding his right to counsel and that, as a *pro se* litigant, he would be held to the same requirements as attorneys. Defendant repeatedly indicated he understood the admonishments and persisted in his request to represent himself, definitively invoking his right of self-representation. Defendant was explicit that he disagreed with counsel's conclusion regarding the merits of his petition and her decision not to file a written response to the motion to dismiss and that he wanted to represent himself. Although he disagreed with counsel's conclusion in these regards, the record demonstrates his waiver of counsel was knowingly and intelligently made. See, *e.g.*, *Lesley*, 2018 IL 122100, ¶ 56 ("[the defendant's] statements indicating his reluctance to represent himself show his awareness of the advantages of representation").

¶ 58    Moreover, defendant's handling of his postconviction proceedings shows his waiver of counsel, while apparently reluctantly made based on counsel's conclusion about his petition, was voluntary and knowing. His *pro se* petition contained six pages of legal argument regarding his claim of ineffective assistance of trial counsel for improperly advising him of the sentences on the lesser-included attempt offenses. He cited to relevant legal authority, addressed both prongs of *Strickland* in arguing his claim, and attached three supporting affidavits. Even prior to being granted leave to proceed *pro se*, defendant came to the hearing on the State's motion to dismiss prepared with a written, 14-page *pro se* response, addressing the State's arguments in turn and again citing to relevant legal authority. Defendant's *pro se* filings and oral argument demonstrated his legal sophistication and that he knowingly wished to represent himself.

¶ 59    In reaching this conclusion, we reject defendant's contentions that counsel could not "stand mute" on defendant's petition. Defendant argues counsel was required to either present his claims

or move to withdraw if she considered the petition frivolous. However, "[c]ounsel's duties, pursuant to Rule 651(c), include consultation with the defendant to ascertain his contentions of deprivation of constitutional right, examination of the record of the proceedings at the trial, and amendment of the petition, *if necessary*, to ensure that defendant's contentions are adequately presented." (Emphasis added.) *Pendleton*, 223 Ill. 2d at 472. Contrary to defendant's assertion, counsel was only required to make amendments to defendant's petition if necessary. As noted above, defendant's petition outlined his ineffectiveness claim with citation to relevant authority, addressed each prong of *Strickland*, and provided supporting affidavits. Thus, where defendant adequately presented his claims, we cannot say it was unreasonable for counsel to conclude that, as she stated in her Rule 651(c) certificate, amendment to defendant's petition was unnecessary.

¶ 60    Further, we note that, in his letter to the trial court, defendant provided excerpts from his correspondence with counsel, none of which support his contention that counsel concluded his petition was frivolous.[1] Defendant's letter merely states that counsel informed him (1) that, in counsel's experience, the court did not allow attorneys to withdraw even if they argue the petition lacks arguable merit but that counsel disagreed and believed parties have a constitutional right to represent themselves and (2) that counsel would not amend or supplement defendant's *pro se* petition and that "a postconviction attorney can stand on the petition, or withdraw as counsel if the pleadings are frivolous." These generalized statements regarding postconviction proceedings do not show that counsel found defendant's petition frivolous. To the contrary, counsel did not move to withdraw, indicating she did not find the petition frivolous. See *People v. Bass*, 2018 IL App (1st) 152650, ¶ 20 ("[I]f the lawyer appointed to represent a postconviction petitioner determines,

---

[1]Copies of counsel's correspondence are not included in the record on appeal.

after fulfilling his or her obligations under Rule 651(c), that the petition cannot be amended, defendant has received the reasonable assistance of counsel the Act contemplates and his entitlement to the assistance of counsel is at an end.").

¶ 61　　We similarly reject defendant's contention that the court should have further inquired into defendant's allegations regarding counsel. As previously noted, defendant wrote the court a letter detailing his concerns with counsel's decision not to amend his petition. Thus, the court was well aware of the details of defendant's allegations, including that he did not agree with counsel's assessment of his petition and that counsel should have consulted with him further "to see if it was possible to 'shore up' the argument for prejudice." The court was also aware of defendant's claim that counsel refused to file a written response to the State's motion to dismiss and heard counsel state she was prepared to argue the motion orally. Moreover, prior to addressing the State's motion to dismiss, the court admonished defendant regarding his right to represent himself and the pitfalls involved in doing so. It discussed with him his reasons for proceeding *pro se*, *i.e.*, his disagreement with counsel's assessment of the case and counsel's refusal to respond to the motion to dismiss in writing. After receiving defendant's detailed letter and discussing the matter in a hearing, the court had ample notice of why defendant wanted to proceed *pro se*. There was no need for further inquiry to determine that defendant's waiver of counsel was knowing and understanding.

¶ 62　　In sum, we find (1) the court did not err in dismissing defendant's postconviction petition where defendant failed to make a substantial showing of a constitutional violation of ineffective assistance of trial counsel and (2) defendant knowingly and voluntarily waived his right to postconviction counsel.

¶ 63　　Affirmed.

**No. 1-17-0491**

| | |
|---|---|
| **Cite as:** | *People v. Rouse*, 2020 IL App (1st) 170491 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 10-CR-17598; the Hon. James N. Karahalios, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Emily Hartman, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Miles J. Keleher, Assistant State's Attorneys, of counsel), for the People. |