2020 IL App (1st) 191360-U

FIFTH DIVISION
DECEMBER 31, 2020

No. 1-19-1360

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 17467 |
| | ) | |
| MICHAEL RUIZ, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The dismissal of the defendant's postconviction petition at the second stage of proceedings is affirmed where the defendant did not make a substantial showing of ineffective assistance of counsel; the trial court did not abuse its discretion in denying the defendant's discovery request.

¶ 2    The defendant-appellant, Michael Ruiz, who was convicted of criminal sexual assault, appeals the second-stage dismissal of his postconviction petition. On appeal, the defendant argues that he made a substantial showing of ineffective assistance of counsel. He also argues that the trial court erred in denying his discovery request. For the reasons that follow, we affirm the

judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4      A full recitation of the facts leading up to this appeal are set forth in detail in this court's

prior order, *People v. Ruiz*, 2016 IL App (1st) 141056-U (hereinafter referred to as *Ruiz I*). All the

facts need not be repeated at length here, and therefore, only those facts relevant to the disposition

of this appeal are repeated *infra*.

¶ 5      The defendant was charged by indictment with two counts of criminal sexual assault

following a May 28, 2012, encounter with the female victim, A.E. The counts alleged the defendant

placed his penis into the victim's vagina with knowledge that the victim was unable to give

knowing consent (720 ILCS 5/11–1. 20(a)(2) (West 2012)) (count 1) and by use of force or threat

of force (720 ILCS 5/111.20(a)(1) (West 2012)) (count 2).

¶ 6      At a bench trial, A.E. testified that on May 28, 2012, the defendant approached her while

she was walking home from a grocery store. The two began a conversation, exchanged phone

numbers, and agreed to meet later that evening at 9:30 p.m. at the corner of Kimball and Fullerton

Avenues.

¶ 7      Later that evening, A.E. and the defendant met as planned. The two began to walk around

the neighborhood, and A.E. suggested they should get something to eat because she had not eaten.

The defendant agreed, but the two walked to a liquor store instead. A.E. claimed not to have known

that they were going to the liquor store. A.E. also claimed she told the defendant that she wanted

"anything but Hennessey." Despite this, the defendant purchased Hennessey and two shot glasses

and nothing else. Neither A.E. nor the defendant purchased food at the liquor store.

¶ 8      The defendant and A.E. walked to a nearby park. A.E. testified that she was unaware that

they were walking to the park. They were alone in the park. They sat underneath a jungle gym and took shots of the Hennessey. The defendant poured A.E. approximately 7 – 10 shots over a couple of hours. While the two were drinking, A.E. received a cell phone call lasting "a couple minutes." A.E.'s attention was turned away from the defendant during the time she was on the phone. After the call she and the defendant continued to drink.

¶ 9     The defendant kissed A.E.'s neck and chest area while the two were at the park. A.E. testified that she voluntarily kissed the defendant, but "when it got too much" she said "no." She explained that she wanted to eat and that she was starting "not to feel very good." She also testified that she wanted to go home and asked the defendant to get a taxi for her. The defendant stopped touching her and left the park to get a taxi. A.E.'s testimony indicated that in the 10 – 15 minutes in which the defendant was gone she was incontinent of urine and feces. The defendant returned without having found a taxi. At the defendant's suggestion, they walked to his house.

¶ 10     On the walk back to the defendant's house, they hailed a taxi, "got in" and then "got right back out" because the defendant "had to go home for some reason." A.E. testified that she felt helpless, sick, and out of control and wanted to go home, but because of her condition she simply followed the defendant to his house. A.E.'s home was three to four blocks from the park. The defendant's home was nine blocks away. A.E. had trouble walking. A.E. initially testified that she did not try to get on a bus even though she had her CTA card because the "bus stops running at midnight." On cross-examination, A.E. stated it was approximately 11 p.m. when she and the defendant left the park and she did not ride the bus because she "didn't see a bus." A.E. never attempted to call someone to "give her a ride" although she had her cell phone with her.

¶ 11     A.E. and the defendant arrived at the defendant's home sometime after midnight. The two

walked upstairs to the attic, and the defendant told A.E. "just to go lay down on the bed." A.E. lay down in the bed—which was a mattress on the floor—fully clothed because she "wasn't feeling good." Her "head was hurting" and she "felt like [she] could throw up." She was lying on her side. The defendant came to lay next to A.E. on the mattress. He was not wearing a shirt. A.E. told the defendant that she "just want[ed] to go to sleep or just cuddle." The defendant ignored this request and instead tried to "kiss" and "touch" her. He "wanted to have sex," but A.E. told him "no."

¶ 12     The defendant then rolled A.E. from her side onto her back, got "on top" of her with his legs between hers, pushed her shoulders down using "a lot of pressure," and told her "we can either do this the easy way or the hard way." A.E. testified that she could not move due to the amount of force the defendant applied to her shoulders; however, she did not try to move because she was scared that while the defendant was pinning her down, he "might have hurt [her]" because of "what he said, that we can do this the easy way or the hard way." A.E. then told the defendant "yes" and explained that "out of fear, [she] consented" to having sex with the defendant.

¶ 13     A.E. did not attempt to call out, scream for help, or struggle, nor did she see the defendant with any weapons. At that point, A.E.'s dress "got taken off." She did not remove her dress and stated that she "believe[d] [the] defendant took [the dress] off [her]." However, she could not remember exactly how her dress was removed. The defendant then inserted his penis into A.E.'s vagina for approximately five minutes. After ejaculating, the defendant "got off [A.E.]" and fell asleep. A.E. also "passed out." A.E. estimated that the defendant weighed approximately 170 to 180 pounds and is 5 foot 10 inches to 5 foot 11 inches tall. A.E. is 5 foot 7 inches and weighed approximately 140 pounds.

¶ 14     A.E. awoke the next day, "a little after 5 a.m." A.E. immediately walked over to a chair,

found a plastic bag, and vomited into it. She was still naked and the dress she had been wearing the night before was "on the side of the bed." It had not been torn. A.E. did not find her underwear. The defendant awoke while A.E. was vomiting and asked if she was okay. After A.E. vomited, she dressed, and the defendant "walked her out" before going back inside his house.

¶ 15    A.E. walked to a corner near the defendant's house and called 911. A.E. initially testified that she realized that her identification card, debit card, and CTA card were missing from her purse while she was on the phone with 911. On re-direct examination, A.E. stated she first realized her identification card was missing while she was looking for her CTA card just after leaving the defendant's house, but prior to calling 911. A.E. did not take her identification card out of her purse at any point that night and it was in her purse when she and the defendant were at the park. She never saw the defendant touch her purse or any of the items missing.

¶ 16    The parties stipulated that the record keeper for A.E.'s cell phone company would testify that four calls were placed from A.E.'s cell phone to the cell number registered to the defendant from 5:30 a.m. to 5:34 a.m. The 911 call was placed at 5:34 a.m. A.E. testified that she did not remember calling the defendant four times prior to contacting 911. She also could not remember if the defendant sent a text message to her cell phone explaining that he found her belongings and could return them to her.

¶ 17    A.E. was in pain and her vagina was sore while she was standing outside waiting for the police to arrive. She was crying when the police arrived because she was "sad," "hurt," and "emotional and scared" after being "raped." An ambulance transported A.E. to a hospital where a sexual assault examination was performed. A.E. also provided a urine sample. Police officers followed her to the hospital and questioned her about the events of the previous night.

¶ 18    After being released from the hospital, A.E. met with a detective at a police station and identified the defendant from a photo array. She did not return home following the incident for approximately two weeks. Instead, she stayed with a friend because she was afraid that if she returned home she would run into the defendant. She explained that the defendant knew where she lived because "he had [her] stuff" including her identification card, even though it was a Florida identification card containing a Florida address. Approximately three months later, on August 29, 2012, A.E. identified the defendant from a lineup at the police station.

¶ 19    A.E. testified that she had felt differently that night than previous times when she had consumed alcohol. She explained that she "felt like [she] had no control" and "had never felt that sick before." A.E. stated she never saw the defendant with anything other than Hennessey, including cough syrup or other "suspicious looking" liquid, nor did she taste cough syrup or anything "funny" when she and the defendant were drinking. A.E. did not take any cold medication, including cough drops or cough syrup, prior to her meeting with the defendant. The last time she had a cold was approximately "a few months" prior to the incident, and she had not taken any cough medicines, including cough syrup or cough drops, within "a few months" prior to the offense.

¶ 20    The parties stipulated to the testimony of emergency room physician, Doctor Vasquez, who performed A.E.'s sexual assault examination. If called to testify, Doctor Vasquez would state that A.E. presented to the hospital with no visible signs of trauma. The genital cultures and urine sample obtained during the examination were placed into a sexual assault evidence collection kit. A proper chain of custody was maintained over these items at all times.

¶ 21    The stipulated testimony of Investigator Mary Embers confirmed that she obtained a buccal

swab from the defendant and submitted the swab to the Illinois State Police Crime Lab for DNA analysis. A proper chain of custody was maintained over this sample at all times.

¶ 22     The stipulated testimony of forensic scientists Christine Weathers and Christine Caccamo established that, to a reasonable degree of certainty, semen was identified on the vaginal, anal, cervical, and thigh swabs collected from A.E.'s sexual assault examination. The semen from the samples was matched to the defendant's DNA profile.

¶ 23     The parties also stipulated to the testimony of Christina Woods, an expert in the field of forensic toxicology, that A.E.'s urine sample tested positive for dextromethorphan. Dextromethorphan can be used as a "date rape" drug and is found in approximately 120 over-the-counter cold medicines. Dextromethorphan's side effects include drowsiness, dizziness, and vomiting, which are likely more severe when the drug is consumed with alcohol. The amount of dextromethorphan in A.E.'s system was not determined.

¶ 24     The defendant moved for directed finding following the parties' stipulations. The trial court granted the defendant's motion with regard to count 1, criminal sexual assault with knowledge the victim was unable to consent, and denied the motion as to count 2, criminal sexual assault by use of force or threat of force. In so ruling, the trial court stated that the victim clearly testified that she gave her consent out of fear. The defendant then rested.

¶ 25     The trial court found the defendant guilty of criminal sexual assault by force or threat of force. In its finding, the court noted that there was no dispute that a sexual act occurred. Rather, the only inquiry was whether the act occurred by the defendant's use of force or threat of force, which depended on the credibility of A.E.'s testimony. The trial court concluded that A.E. testified credibly despite the inconsistencies in her testimony, and that to adopt the defendant's position, it

would have to reject A.E.'s testimony that the defendant "is on top of her and said we can do this the easy way or the hard way, that that never happened and she is making that part up." In determining that A.E. testified "convincingly and credibly," the trial court considered A.E.'s "manner while testifying, *** the reasonableness of her testimony," and the "propensity evidence" presented by the State.

¶ 26    The trial court also concluded that the circumstantial evidence suggested that more likely than not, it was the defendant who administered the dextromethorphan to A.E. at some point during the time leading up to the commission of the offense. It also stated that A.E.'s actions the following morning "[were] driven by the fact that she had no bus pass, *** no ID, and that these items were in her purse. Someone had to remove them. It wasn't her that removed it."

¶ 27    The trial court subsequently denied the defendant's motion for new trial and the case proceeded to sentencing. The defendant was sentenced to 25 years' imprisonment as a Class X offender based upon his criminal background.

¶ 28    The defendant then appealed to this court. On direct appeal, the defendant argued that the evidence was insufficient to prove him guilty of criminal sexual assault beyond a reasonable doubt. *Ruiz I*, ¶ 27. This court rejected the defendant's arguments:

    "[W]e find that the trial court could reasonably conclude that [the] defendant's act of rolling A.E. onto her back, getting on top of her, pinning her to the bed by exerting 'a lot' of pressure on her shoulders, and telling her 'we can do this the easy way or the hard way,' was sufficient to establish [the] defendant used force or threat of force in the commission of the offense.

        ***

[B]ecause A.E.'s testimony, which the trial court found credible, established beyond a reasonable doubt that [the] defendant sexually assaulted A.E. when he forcibly engaged in sexual intercourse with her against her will, therefore we cannot find the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of [the] defendant's guilt." *Id.* ¶¶ 38, 43.

This court accordingly affirmed the defendant's conviction of criminal sexual assault. *Id.* ¶ 44.

¶ 29    On June 28, 2017, the defendant filed a postconviction petition, which is the subject of the instant appeal. In the petition, the defendant argued that he received ineffective assistance of counsel when his defense counsel: (1) stipulated to the testimony of Christina Woods that A.E.'s urine sample tested positive for dextromethorphan; (2) failed to obtain an expert to provide their opinion that the finding of an unknown amount of dextromethorphan is "non-probative and inconsistent" with A.E.'s testimony; (3) failed to perfect impeachment of A.E. "as to several material points"; (4) failed to elicit, from A.E. during her cross-examination, "several material facts which militated against her claim that [the defendant] forced her to have sex against her will"; (5) failed to "impeach A.E. with several material facts and omissions which cast doubt on the credibility of her story"; and (6) failed to subpoena some bank and phone records which would "have tended to prove that A.E. was not under the influence and retained the ability to give or refuse consent." The petition also claimed that the defendant was innocent because the sexual intercourse with A.E. was consensual and not forced.

¶ 30    To his petition, the defendant attached: (1) the police incident report from Chicago Police Officer Aaron Levine; (2) the supplementary police report from Chicago Police Officer Susan

Ruck; (3) a report and affidavit from Dr. James T. O'Donnell, PharmD, MS FCP; and (4) the defendant's own affidavit. Dr. O'Donnell's affidavit provided the following opinions:

"1. Detection of dextromethorphan is not evidence of recent use or impairment.

2. Detection of any substance in the urine can never be used to infer precise time of use or impairment at any particular time.

3. Dextromethorphan is not listed in the 'commonly identified date rape drugs.' When taken in excess doses and via alternative methods, [dextromethorphan] can actually act as a dissociative anesthetic, mimicking the effects of drugs like PCP and Ketamine, a 'date-rape' drug.

4. If dextromethorphan was taken in excess (*i.e.*, sufficient amount/dose) to cause sedative effects, those effects most likely would be present at [5:30 a.m.] when [A.E.] met with the responding Police Officers, and later when subsequently examined in the St. Mary [of] Nazareth Emergency Room, ***. A.E. had no signs of [dextromethorphan] excess ***; it is unlikely that she was exposed to a large dose of [dextromethorphan].

5. A single therapeutic dose of any form of dextromethorphan would be detectable in urine for several days. Since there are more than 100 products available [over the counter], the patient does not always know [dextromethorphan] is consumed, unless the label is carefully examined.

***

There is no evidence that A.E. was intoxicated, impaired, incapacitated, or poisoned with dextromethorphan. The finding of dextromethorphan in this case is NOT evidence of impairment. The evidence in this case is against a dextromethorphan overdose. Had I been

asked to consult in the case-in-chief by either the prosecution or the defense lawyer, I would have so testified."

¶ 31    The defendant's affidavit detailed the events of the night of the incident. It stated, in relevant part:

"[ ]. Not once did A.E. mention to me that she was hungry or else we would have gotten something to eat because we were surrounded by many restaurants, including McDonalds.

[ ]. Instead we walked into a liquor store which was located in the middle of all the restaurants.

[ ]. Together we both walked down each aisle searching for a drink (alcohol) we wanted to have and ended in agreement together, I asked A.E. what kind of soda or juice should we get to chase the Hennessy down with and she responded back in a funny but challenging way saying: 'I don't need a chaser! I can hang, can you?'

[ ]. I took that to mean that she was strong enough to drink it straight.

[ ]. So we did not buy a chaser or anything else.

[ ]. When we got to the park we wanted to sit down, but also be in private, so we went underneath the jungle gym.

[ ]. Due to our size, it was very enclosed with very little space but just enough for us to sit down facing each other side by side.

[ ]. As we continued or [*sic*] conversation now underneath the jungle gym, we each had shots of Hennessy when the other did matching each other every time.

[ ]. Some times [I] poured the shots and other times she did.

[ ]. A.E. did receive a call during our time there underneath the jungle gym and ended it quickly when she answered.

[ ]. No shots were poured or drunk during her short time on the phone.

[ ]. Based on the set-up, seating and space between us we had no choice but to have eyes on each other the entire time.

[ ]. At most we had two feet of separation between us which made it impossible for either of us to be unaware of each other's action.

[ ]. At no time did I spike the Hennessy, administer any sort of 'date rape' drug or otherwise attempt to drug or incapacitate A.E."

The affidavit then stated that the defendant and A.E. had consensual sex under the jungle gym. Afterwards, they left and tried to hail a taxi for A.E. The defendant's affidavit continued:

"[ ]. As we waited at the corner for a cab to pass by I asked her if she had any cash because she may need it for the cab.

[ ]. She said 'no,' but she could get some from the ATM machine.

[ ]. The nearest ATM to us was half a block west of Diversy [*sic*] and Kimball.

[ ]. There was a small plaza with a liquor store, laundromat, and Dunkin Donuts.

[ ]. We walked into the liquor store and A.E. attempted several times to withdraw cash from the ATM machine.

[ ]. She failed each time to access her account which resulted in her security locking her out of the account.

[ ]. We were returned [*sic*] to the six corner intersection to continue searching for a cab.

[ ]. While sitting down at bus stop bench of Kimball and Diversy [*sic*] waiting for a cab to pass by, A.E. expressed to me that she wanted to call Chase Bank's 24/7 operator service line to receive help in accessing her bank account.

[ ]. A.E. and I share the same bank and I already had the number stored on my phone so I let A.E. call Chase Bank from my cell phone.

[ ]. She spent 5 - 11 minutes arguing back and forth with the operator because she said they couldn't help her unless she personally came into the bank the next morning. This made A.E. very upset and she hung up on them."

According to the defendant's affidavit, he and A.E. eventually returned to his apartment where they kissed and slept but did not have sex. Early the next morning, A.E. left his apartment. Later that same day, when the defendant was pulling his phone out of his pocket, he realized that he had "A.E.'s Florida I.D. and ATM card." His affidavit stated:

"I immediately remembered that last night when A.E. was speaking to the Chase Bank operator she asked me to hold her I.D. and ATM card for her when she was reading off the information the operator requested. * * * I forgot to return it to her when she was done speaking to the operator. * * * I looked at my phone and saw that I had four missed calls from A.E. * * * I then texted her stating: 'I'm sorry I missed your calls, but I have your I.D. and ATM card. How can I get them back to you?' "

The affidavit concluded with the defendant's statement that he never drugged A.E. and never used force or threat of force to make A.E. have sex with him.

¶ 32    The defendant's postconviction petition advanced to the second stage of proceedings. The State then filed a motion to dismiss the petition, arguing that *res judicata* applied to the defendant's

claim of actual innocence where this court had already rejected the defendant's insufficient evidence argument. The State's motion to dismiss further argued that the defendant failed to establish that he received ineffective assistance of counsel.

¶ 33    According to the defendant, during arguments, when discussing his argument that his defense counsel failed to subpoena bank and phone records, the defendant verbally "requested that the court give permission to issue subpoenas," but the court "responded that subpoenas could be issued during third stage proceedings" and denied the defendant's discovery request.[1]

¶ 34    Following arguments from both parties, the trial court granted the State's motion and dismissed the defendant's postconviction petition at the second stage of proceedings. The trial court's written order began by noting that "many of the issues that [the defendant] raises are barred by the doctrine of *res judicata*." The trial court's order went on to reject all of the defendant's claims of ineffective assistance of counsel. The trial court accordingly found that the defendant had not made a substantial showing of a violation of his constitutional rights and dismissed the petition. This appeal followed.

¶ 35                              ANALYSIS

¶ 36    We note that we have jurisdiction to consider this matter, as the defendant filed a timely notice of appeal following the dismissal of his postconviction petition. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 37    The defendant presents the following issues on appeal: (1) whether the trial court erred in dismissing his postconviction petition when the petition made a substantial showing of ineffective

---

[1]The defendant does not cite to anywhere in the record regarding his discovery request. Indeed, the defendant did not include, in the record on appeal, any report of proceedings from the postconviction proceedings.

assistance of counsel based on defense counsel's stipulation to the dextromethorphan evidence and failure to present an expert witness to refute that evidence; (2) whether the trial court erred in dismissing his postconviction petition when the petition made a substantial showing of ineffective assistance of counsel based on defense counsel's failure to elicit exculpatory evidence from A.E. and failure to impeach her during her cross-examination; and (3) whether the trial court erred in denying the defendant's discovery request.[2]

¶ 38    As an initial matter, we note that the defendant has failed to include, in the record on appeal, a report of proceedings from the postconviction proceedings. It is the burden of the defendant, as the appellant, to supply this court with an adequate record on appeal. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391–92 (1984)). An adequate record on appeal includes report of proceedings, a bystander's report, or an agreed statement of facts including all the evidence pertinent to the issues on appeal. Ill. S. Ct. R. 323 (eff. July 1, 2017). In the absence of an adequate record, it is presumed that the trial court acted in conformity with the law and that the findings were based on the evidence presented. *Watkins v. Office of State Appellate Defender*, 2012 IL App (1st) 111756, ¶ 19. Accordingly, any doubts arising from the incomplete record in this case will be resolved against the defendant.

¶ 39    The defendant first argues that he made a substantial showing that he received ineffective assistance of counsel when his defense counsel stipulated to the dextromethorphan evidence and failed to present an expert witness to refute that evidence. In support of his argument, the defendant cites to Dr. O'Donnell's affidavit, and claims that it "establishes that the only possible explanation for A.E.'s bizarre behavior during the night in question -- that she was suffering from the effects

---

[2]Although the defendant also alleged actual innocence in his postconviction petition, he does not raise that issue on appeal.

of a date rape drug mixed with alcohol -- was scientifically impossible." He argues that the stipulated evidence regarding dextromethorphan boosted A.E.'s credibility, and so defense counsel should have objected to it and presented an expert witness to explain that A.E. could not have been incapacitated by dextromethorphan; meaning that the defendant would have had to use "tremendous force" in order to sexually assault her. The defendant avers that his defense counsel was deficient for not objecting to the stipulated dextromethorphan evidence and for not presenting a counter-expert witness, and that the outcome of his trial would likely have been different had defense counsel done so. He asks us to reverse the trial court's dismissal of his postconviction petition and remand the case for third-stage proceedings.

¶ 40    The Post-Conviction Hearing Act (Act) allows a defendant who is imprisoned in a penitentiary to challenge his conviction or sentence for violations of his federal or state constitutional rights. 725 ILCS 5/122-1 (West 2016); see also *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005). The Act establishes a three-stage process for adjudicating a postconviction petition. 725 ILCS 5/122-1. During the first stage, the trial court must independently review the petition, taking the allegations as true, in order to determine whether the petition is frivolous or patently without merit. *People v. Tate*, 2012 IL 112214, ¶ 9; 725 ILCS 5/122-2.1(a)(2) (West 2016)). If the petition survives dismissal at this stage, it advances to the second stage, where counsel may be appointed, and the State may move to dismiss the petition. *People v. Harris*, 224 Ill. 2d 115, 126 (2007). At the second stage, the defendant must make a substantial showing of a constitutional violation in order to proceed to the third and final stage of the postconviction process and obtain an evidentiary hearing. *Id.* (citing 725 ILCS 5/122-6 (West 2016)).

¶ 41    Here, only the second stage is at issue. At the second stage of postconviction proceedings,

we do not engage in fact-finding or credibility determinations, but take all well-pleaded facts not positively rebutted by the record as true. *People v. Smith*, 2015 IL App (1st) 140494, ¶ 17. We review *de novo* the trial court's dismissal of a petition at the second stage. *People v. Sanders*, 2016 IL 118123, ¶ 31.

¶ 42    The defendant's postconviction petition was based on his assertion that he received ineffective assistance of counsel. In order to establish that he suffered ineffective assistance of counsel, a defendant must show *both* that (1) his counsel's representation fell below an objective standard of reasonableness; *and* (2) he suffered prejudice in that there is a reasonable probability that but for counsel's errors the outcome of the proceeding would have been different. *People v. Rouse*, 2020 IL App (1st) 170491, ¶ 46 (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984)). When a reviewing court addresses an ineffective assistance of counsel claim, it need not apply the two-part test in numerical order. *People v. Johnson*, 2020 IL App (1st) 172987, ¶ 41.

¶ 43    We need not evaluate defense counsel's performance because the defendant has not made a substantial showing of prejudice. Prejudice is a reasonable probability of a different result of the proceeding absent counsel's deficiency, and a reasonable probability is probability sufficient to undermine confidence in the outcome. *People v. Veach*, 2017 IL 120649, ¶ 30. There is no reasonable probability here that, had defense counsel objected to the dextromethorphan evidence stipulation and presented a counter-expert witness, the defendant would not have been found guilty. The record shows that the defendant was found guilty based on *A.E.'s testimony* that the defendant rolled A.E. onto her back, got "on top" of her with his legs between hers, pushed her shoulders down using "a lot of pressure," while telling her "we can either do this the easy way or the hard way" and so A.E. consented to having sex with the defendant out of fear. That testimony,

*on its own*, was sufficient to convict the defendant of criminal sexual assault by force or threat of force. *People v. Wells*, 2019 IL App (1st) 163247, ¶ 23 (the unequivocal testimony of a single witness is sufficient to convict). Notably, the defendant was *not* found guilty of criminal sexual assault with knowledge that the victim was unable to consent. That is a charge for which the dextromethorphan evidence would have been relevant.

¶ 44    Indeed, although in *Ruiz I* this court discussed the circumstantial evidence of dextromethorphan in A.E.'s urine and A.E.'s intoxicated state on the night of the incident, we ultimately concluded:

> "[T]he trial court could reasonably conclude that [the] defendant's act of rolling A.E. onto her back, getting on top of her, pinning her to the bed by exerting 'a lot' of pressure on her shoulders, and telling her 'we can do this the easy way or the hard way,' was sufficient to establish [the] defendant used force or threat of force in the commission of the offense." *Ruiz I*, ¶ 38.

Whether A.E. was intoxicated or on dextromethorphan is irrelevant to the evidence upon which the trial court relied in finding the defendant guilty. Further, the dextromethorphan evidence had no impact on A.E.'s credibility at trial. Even assuming *arguendo* that defense counsel had objected to the dextromethorphan stipulation and had presented Dr. O'Donnell as an expert witness, there is no reasonable probability that the outcome of the defendant's trial would have been different. To find to the contrary would require us to ignore the primary evidence presented at trial and upon which the trial court relied in finding the defendant guilty. Thus, the defendant was not prejudiced. See *People v. Miramontes*, 2018 IL App (1st) 160410, ¶ 19 (a defendant is prejudiced *only* when there is a reasonable probability that there would have been a *different outcome* in the defendant's

trial). We therefore find that the defendant did not receive ineffective assistance of counsel based on his defense counsel's stipulation to the dextromethorphan evidence. Thus, his failure to present an expert witness to refute that evidence did not amount to ineffective assistance of counsel.

¶ 45 The defendant next argues that he received ineffective assistance of counsel when defense counsel failed to challenge A.E. during cross-examination. Specifically, he claims that defense counsel failed to elicit exculpatory facts, impeach her, and question her about material omissions and inconsistencies in her various statements. The defendant claims that if defense counsel had done so, it would have highlighted that A.E.'s testimony was "suspect" and changed the outcome of his trial. He again requests that this court reverse the trial court and remand the case for third-stage proceedings.

¶ 46 None of the "exculpatory facts," "omissions," and "inconsistencies" alleged by the defendant relate to A.E.'s testimony that the defendant rolled her onto her back, got "on top" of her with his legs in between hers, pushed her shoulders down using "a lot of pressure," and told her "we can either do this the easy way or the hard way" thereby getting her to consent out of fear. For instance, the defendant argues that certain details in one of the police incident reports should have been elicited to show that he did not use force to have sex with A.E. We reject this argument because it would not have impacted her testimony in any way. The same is true for all the other "exculpatory facts" and "inconsistencies" alleged by the defendant. None of the "exculpatory facts" which the defendant complains should have been elicited would have had *any* impact on A.E.'s testimony upon which the court relied. Thus, there is no prejudice.

¶ 47 The defendant's additional arguments regarding defense counsel's deficiencies in failing to impeach A.E. with omissions and inconsistencies in prior statements, suffer from the same

flaws. Further, it is well established that the impeachment of witnesses is generally considered a matter of trial strategy, immune from claims of ineffective assistance of counsel. *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 58. The only exception to this rule is when defense counsel's trial strategy is *so* unsound, such as completely failing to impeach a sole eyewitness when significant impeachment is available, or when counsel fails to conduct *any* meaningful adversarial testing. *Id.* No such deficiencies occurred here.

¶ 48     The defendant therefore cannot establish that defense counsel was deficient on this basis. Consequently, the defendant failed to make a substantial showing that he received ineffective assistance of counsel and the trial court properly dismissed his postconviction petition.

¶ 49     The defendant's final argument is that the trial court erred by denying his discovery request to issue subpoenas for bank and phone records from the night of the incident. He claims that these records would show that A.E. used the ATM and spoke to a bank operator on the defendant's cell phone. He requests that this court reverse the trial court's ruling and remand the case to the trial court with directions to grant his discovery request.

¶ 50     Under the Act, a defendant must show good cause for granting a discovery request made during postconviction proceedings. *People v. Dixon*, 2019 IL App (1st) 160443, ¶ 30. A trial court's decision to grant or deny a postconviction discovery request is well within its discretion and this court will not disturb that decision absent an abuse of discretion. *Id.*

¶ 51     The defendant does not explain *how* his discovery request for bank and phone records showed good cause. Stated another way, he has not clarified how his and A.E.'s supposed visit to an ATM and her subsequent phone call to the bank would have *any* impact on the finding by the trial court that the defendant used force or threat of force to sexually assault A.E. Thus, it cannot

be said that the trial court abused its discretion in denying the defendant's discovery request.

¶ 52                                CONCLUSION

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.