2024 IL App (1st) 230603-U

No. 1-23-0603

Order filed June 20, 2024

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 4268 (02) |
| | ) | |
| WILLIE MULLEN, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Rochford and Justice Ocasio concurred in the judgment.

**ORDER**

¶ 1      *Held*: The circuit court properly dismissed Mullen's postconviction petition at the second stage where the petition failed to make a substantial showing that trial counsel was ineffective. Mullen did not rebut the presumption that postconviction counsel provided reasonable assistance.

¶ 2      Defendant Willie Mullen appeals from the second-stage dismissal of his postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)). On appeal, Mullen contends that he made a substantial showing that trial counsel was ineffective for failing to investigate and call two witnesses, and that postconviction counsel

provided unreasonable assistance where he filed a deficient certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), and the record did not establish that he fulfilled the duties required by the rule. We affirm.[1]

¶ 2                                   I. BACKGROUND

¶ 3      Following a bench trial in February 2015, Mullen was found guilty of the first degree murder of Cecil Ward and was sentenced to 45 years' imprisonment. The facts are detailed in this court's order on direct appeal. See *People v. Mullen*, 2018 IL App (1st) 152415-U. Accordingly, we recount only the facts necessary to resolve the present appeal.

¶ 4      In February 2010, Mullen was charged by indictment with six counts of first degree murder. Anthony White was charged with one count of conspiracy to commit the first degree murder of Ward and one count of first degree murder. Prior to Mullen's trial, White pleaded guilty to conspiracy to commit first degree murder.

¶ 5      The State's supplemental answer to discovery, filed on February 11, 2014, stated that on January 13, 2014, Liketta Lucas informed two assistant state's attorneys (ASAs) that on the date of the incident, Mullen was at home with her, and she did not know Ward.[2] According to Lucas, she had an order of protection against Mullen at the time of the incident, and she "would call the police and file charges when she got mad at him for seeing other women."

¶ 6      Prior to trial, defense counsel filed motions to suppress photograph identifications of Mullen made by Randy Nowak and Hasan Awwad, arguing that the identifications were

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] The record on appeal also refers to Liketta Lucas as "Lakita Lucas." We adopt the spelling from, *inter alia*, Lucas's affidavit included in the record. The record establishes that Lucas was also known as "Keisha."

unnecessarily suggestive and coercive.[3] The court granted the State's motions for directed findings, noting that Mullen presented no evidence that the identifications were unnecessarily suggestive.

¶ 7    At trial, Awwad testified that at approximately 3:45 p.m. on November 16, 2009, he was with Nowak, a friend, near Homan Avenue and Howard Street in Chicago. Nowak was "dope sick" and asked Awwad for help buying drugs. After purchasing drugs, but prior to Nowak using them, they heard gunshots. Awwad saw Mullen, whom he identified in court, wearing a hoody and standing near a vehicle, pointing a firearm at a man inside. Another vehicle, which had blocked the path of the vehicle into which Mullen fired, then drove away. Awwad checked the shooting victim's pulse and called 911. He and Nowak then went to an abandoned house so that Nowak could ingest the drugs. Police questioned them and took them to the police station.

¶ 8    On January 28, 2010, Awwad viewed a photographic array wherein he identified Mullen, whom he recognized because he had "cornrows" or "little twists" in his hair, as the shooter. On the same date, Awwad gave a written statement to police officers and told them he could see the shooter's hairstyle, but Awwad did not know whether that assertion was included in the written statement. He also informed a detective about the shooter's hairstyle. Awwad stated that Mullen shot the other man "once in the throat and then a couple more times," turned, "glimpse[ed]" Awwad, and ran into an alley. Awwad testified that "[t]he hoody came off," and he saw Mullen's cornrows. On cross-examination, Awwad stated that Nowak was very sick, so he helped Nowak walk and gave Nowak heroin to sniff prior to the shooting.

¶ 9    Nowak testified that he observed Mullen, whom he identified in court, firing into a parked

---

[3]The record also refers to Randy Nowak as "Randy Novak." We adopt the spelling from the trial transcript.

vehicle. A second parked vehicle "block[ed]" the vehicle into which Mullen fired. The second vehicle's hood was raised, and the vehicle seemed "broke down." Mullen ran into an alley and the second vehicle left, but it later returned with Mullen as a passenger. On January 29, 2010, while in prison, Nowak viewed a photographic array and identified Mullen as the shooter.

¶ 10    On cross-examination, Nowak agreed with the State that he was addicted to heroin at the time of the incident but denied being "dope sick." Nowak ingested heroin after the incident, and prior to giving the police a description of the shooter. Nowak informed the detectives that Mullen wore a black skull cap, black jacket, and blue jeans, and had "braids." Although Mullen wore a skull cap, Nowak saw that he had "dreads" or "braids" falling out of the cap. Following the shooting, Nowak had been convicted of possession of a controlled substance and felony retail theft. Nowak also had two other felony retail theft convictions.

¶ 11    White testified that he came to an agreement with the State's Attorney's Office to plead guilty to conspiracy to commit murder in exchange for 15 years' imprisonment. The State agreed to dismiss the murder charge in return for White's honest and truthful testimony at Mullen's trial.[4] On the morning of November 17, 2009, White went to the area of Christiana Avenue and Huron Street to sell drugs. In the early afternoon, White saw Mullen, whom he had known his whole life. Mullen told White that Mullen's girlfriend Lucas was cheating on Mullen with Ward, and that Mullen had seen Lucas and Ward leave a hotel together. Mullen spoke about "getting down on" Ward.

¶ 12    At Mullen's request, White entered a nearby store and asked "Tony," one of the owners, to open the back door. Tony did not open the door. After a conversation with Mullen's uncle, who

---

[4]As part of the same agreement, White also pleaded guilty to two unrelated possession charges, with the sentences to run concurrent to his sentence for conspiracy to commit murder.

was also inside the store, White left. Mullen then told White to park on Huron, "pop [his] hood," and pretend that his vehicle was not working. White did so. Then, White saw Mullen exit an alley, walk to a vehicle in which Ward was sitting in the driver's seat, and discharge a firearm through the driver's window. Afterward, Mullen ran through the alley and White drove the vehicle around the block. There, he saw two men near Ward's vehicle and conversed with them.

¶ 13 White testified that a police "POD" video recorded by a street camera accurately depicted the events that occurred during the shooting. The video was published, and White narrated it in court. The POD video depicts White exiting his vehicle and activating the hazard lights. An individual, whom White identified as Mullen, approaches Ward's vehicle and fires multiple gunshots at Ward. The video does not clearly show the shooter's face, whether his head is covered, or if his hair is visible.

¶ 14 White was arrested on January 26, 2010, for possession of a controlled substance and spoke with the police regarding the Ward shooting. White did not originally tell police the truth about the incident because he did not want to implicate himself.

¶ 15 On cross-examination, White acknowledged that after telling police that Mullen wanted him to speak with Tony in the store, he "changed [his] story" and told police that he "never talked to Tony." White also changed his "story" regarding other events of that day during his conversations with the police. At one point, White told the police that another drug dealer, Anthony Hoskins, drove the vehicle which was parked with the hood raised. He also informed them that White's cousin, Tyesha Johnson, was in the vehicle with Hoskins. White denied that Mullen was in White's vehicle when White left the scene, although White did have a passenger named Terrell Owens.

¶ 16    The State introduced evidence that Awwad initially informed the detective who administered the photo array that the photos were not "as clear as he'd like and he preferred to do a physical lineup." The next day, Awwad viewed a physical lineup and identified Mullen as the shooter. The detective investigated Ward's cellphone and found no number for Lucas.

¶ 17    For the defense, Reginald Minor testified that he was driving near the intersection of Huron and Homan and observed a stalled vehicle on the street. A man was in front of the raised hood with his back to Minor. Another man emerged from a nearby building and entered a vehicle and, "almost simultaneously," another man followed him and stood outside of the vehicle. Minor was unable to see the third man's face, which was covered with a shirt. Minor did not know whether the man was wearing a hood or a hat but testified that only his eyes were visible. Minor "noticed a popping sound and a flash," and realized the third man was discharging a firearm into the vehicle. Once the shooting began, the man by the stalled vehicle "took off." The shooter ran into an alley. Minor did not see a hood or hat fall from the shooter, nor did he observe the hairstyle of the shooter.

¶ 18    After the shooting, Minor approached the man who had been shot in the vehicle and dialed 911, but the man died. Minor gave officers his statement and was unable to identify any individual from lineups held on January 29, 2010, and January 30, 2010.

¶ 19    Mullen's uncle, Vashon Woolridge, testified that he was not in the area when the shooting occurred and denied conversing with White in the store.

¶ 20    The court found Mullen guilty of first degree murder. In ruling, the court found that Minor was a "very credible" witness, and Nowak was not credible because he was in the area to purchase drugs, was "dope sick," and had consumed drugs prior to the shooting. The court believed that Awwad's observation was "clear," and that he "got a glimpse" of the shooter's face, but he

observed the photo array and lineup "over two months later," on January 29, 2010, and was unsure of the shooter. The court noted that Awwad remembered that the shooter had "corn rolls," and identified Mullen as the shooter based upon his hairstyle.

¶ 21 The court commented that Awwad's testimony alone would not be enough to constitute proof beyond a reasonable doubt. The court also noted that White only volunteered information regarding the murder after his arrest for a drug case, but that fact did not necessarily mean that he lied about the identity of the shooter. The court noted that no physical evidence connected Mullen to the offense, so "the State's case falls and rises on the testimony of [White] and [Awwad]." After a hearing, the court sentenced Mullen to 45 years' imprisonment.

¶ 22 On direct appeal, Mullen argued that the State failed to prove him guilty beyond a reasonable doubt given the "self-serving and unbelievable testimony of [White]," and two other identifications which were not believable. We affirmed and amended Mullen's fines and fees order. *People v. Mullen*, 2018 IL App (1st) 152415-U. In finding the evidence sufficient, we noted that White's testimony was corroborated by Awwad, the POD video, and Minor. *Id*. ¶¶ 48-57.

¶ 23 On March 3, 2020, Mullen filed a *pro se* postconviction petition. Mullen argued, *inter alia*, that trial counsel was ineffective for failing to investigate Najeh Samad, also known as Tony, the store owner, who would have testified that White never entered the store before the shooting and he never spoke with White that day. Mullen also contended that trial counsel was ineffective for failing to investigate Lucas, who would have testified that she never left a hotel with Ward, whom she did not know, and that she dated Mullen exclusively before and after Ward's death. Mullen stated that trial counsel was aware of both Samad and Lucas prior to trial.

¶ 24    Mullen attached his affidavit and the affidavits of Samad and Lucas. Mullen averred that prior to trial, he asked his trial attorney to call additional witnesses to testify in response to White's lies, but trial counsel "seemed uninterested in the idea [because] they weren't witnesses" to the shooting.[5] Samad averred that "[i]n October of 2009," he was at his store and heard gunshots. Samad never saw White in the store or conversed with him the day of the shooting. Samar was willing to speak with Mullen's lawyer but was never interviewed. Lucas averred that she did not know Ward, never had a relationship with him, and never left a hotel with him. Lucas dated Mullen exclusively around the time of Ward's death, and informed Mullen that she did "not understand why anyone would place [her] anywhere near a person [she did] not know." According to Lucas, Mullen's lawyer never spoke with her about the facts in her affidavit.

¶ 25    The circuit court advanced Mullen's petition to the second stage of proceedings and appointed postconviction counsel.

¶ 26    On February 17, 2022, postconviction counsel filed a supplemental petition and a certificate pursuant to Illinois Supreme Court Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. July 1, 2017)). Postconviction counsel argued that, had trial counsel investigated Samad, White's testimony would have been impeached regarding White's presence at the store. Postconviction counsel further contended that the State introduced motive through White's testimony, regarding a purported sexual relationship between Lucas and Ward. Lucas would have testified that she did not know Ward and was exclusively dating Mullen. As Mullen's conviction relied upon the combined testimony of Awwad and White, it was "critical to investigate White's allegations." Had

---

[5]Mullen's affidavit states that he wished "Willie Mullen" and Lucas to testify, with "Willie Mullen" handwritten in a blank space on the typed affidavit. From context, it appears that the name should be Samad's.

counsel investigated, he would have gained testimony from independent witness Samad and from Lucas that impeached key witness White. Postconviction counsel also contended that counsel on direct appeal was ineffective for failing to raise these issues.

¶ 27 Postconviction counsel's Rule 651(c) certificate stated that he consulted with Mullen by mail and phone to ascertain his contentions of deprivations of constitutional rights. Counsel also stated that he "obtained and examined the record (report of proceedings and common law record) from [Mullen's] trial and reviewed the relevant case law related to [Mullen's] claims." Lastly, counsel stated that he prepared a supplemental petition for postconviction relief.

¶ 28 On August 16, 2022, the State filed a motion to dismiss Mullen's petition. The State argued that the record rebutted Mullen's assertion that trial counsel was ineffective for failing to investigate Samad, as White testified on cross-examination that he informed the police that he never spoke to "Tony." Further, the State argued that Mullen failed to establish that trial counsel was ineffective for failing to investigate Lucas because, *inter alia*, proof of motive was not necessary for a conviction. Additionally, Lucas could not refute the conversation between Mullen and White regarding her purported affair with Ward, as she lacked firsthand knowledge of the conversation. In any event, impeachment evidence typically is not so conclusive as to justify postconviction relief. The State noted that the supplemental answer to discovery stated that Lucas had an order of protection against Mullen at the time of the shooting, so trial counsel was aware of Lucas prior to the trial.

¶ 29 Prior to the hearing on the State's motion, the court asked postconviction counsel whether he filed a written response to the State's motion, and counsel stated that he was "resting on the supplemental filings as well as the *pro se* filings."

¶ 30    On March 27, 2023, after a hearing, the circuit court dismissed Mullen's petition. First, the court clarified that it found Mullen guilty based on White's and Awwad's testimonies, but also the POD video and Minor's testimony, which corroborated White's testimony regarding the sequence of events. The court believed "trial counsel should have investigated the case," but his failure was not so "egregious" as to alter the outcome of the litigation. It noted that White was thoroughly cross-examined and he admitted that he did not speak with the store manager. The court commented that given the totality of the evidence, the outcome would not have been different had trial counsel called Samad to rebut White's testimony. The court stated, *inter alia*, that Lucas denied having an affair with Ward, but her statements were not proof that Mullen did not believe an affair occurred. Further, Lucas filed an order of protection against Mullen, which established that Mullen was jealous or abusive and "could have had an irrational belief that [Lucas] was involved in an affair."

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, Mullen first argues that the circuit court erred in dismissing his postconviction petition, which made a substantial showing that trial counsel was ineffective for failing to investigate Samad and Lucas. According to Mullen, White's testimony was "the linchpin of the State's case," and had Samad and Lucas testified, the trial court would likely have found White to be "an utterly incredible witness unworthy of any belief."

¶ 33    The Act provides a three-stage mechanism for imprisoned persons to collaterally challenge convictions for violations of federal or state constitutional rights. 725 ILCS 5/122-1 *et seq*. (West 2020); *People v. LaPointe*, 227 Ill. 2d 39, 43 (2007). A petition survives dismissal at the first stage if its claims are not frivolous or patently without merit, and the defendant alleges enough facts to

raise a claim that is arguably constitutional. 725 ILCS 5/122-2.1(a)(2) (West 2020); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). At the second stage, counsel is appointed if a defendant is indigent, and the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-4, 122-5 (West 2020); *People v. Domagala*, 2013 IL 113688, ¶ 33. The circuit court here dismissed Mullen's petition at the second stage.

¶ 34    In order to survive dismissal at the second stage of proceedings, the defendant bears the burden of making a substantial showing of a constitutional violation. *Id*. ¶ 35. The court does not engage in fact-finding or credibility determinations but must take all well-pleaded facts not positively rebutted by the record as true. *People v. Smith*, 2015 IL App (1st) 140494, ¶ 21. The second stage tests the legal sufficiency of the petition, which survives dismissal where the allegations would entitle petitioner to relief if proven at an evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 35. Our review is *de novo*. *People v. Suarez*, 224 Ill. 2d 37, 42 (2007).

¶ 35    Mullen contends his petition made a substantial showing of ineffective assistance of trial counsel. To state a claim of ineffective assistance of counsel, the defendant must demonstrate that (1) counsel's performance "fell below an objective standard of reasonableness," and (2) the defendant was prejudiced by counsel's deficient performance where a reasonable probability exists that but for counsel's errors, the result of the proceeding would have been different. *People v. Rouse*, 2020 IL App (1st) 170491, ¶ 46 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). The deficient performance prong also requires the defendant overcome the "strong presumption" that the challenged action or inaction is the product of sound trial strategy. *People v. Dupree*, 2018 IL 122307, ¶ 44. "This is a high bar to clear since matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *Id*. Additionally, if the

defendant fails to establish prejudice, then we can dispose of the ineffective assistance claim for that reason alone. *Id.*

¶ 36    Here, Mullen cannot establish that trial counsel's alleged failure to investigate either witness was prejudicial. First, neither Samad's nor Lucas's averments challenge Mullen's identity as the shooter, but rather White's credibility. Although White admitted he gave different descriptions to officers of certain elements of the incident, he never wavered on his identification of Mullen as the shooter, and neither Samad's nor Lucas's affidavits attack that critical issue. Second, according to Samad's affidavit, he would have testified that White never entered his store or conversed with him. However, during trial counsel's cross-examination of White, counsel had adduced similar information, when White admitted that, although his "story" to police changed multiple times, he informed the police that he never spoke with "Tony," *i.e.*, Samad, on the day of the shooting. Similarly, trial counsel had elicited testimony from Mullen's uncle that, contrary to White's testimony, he did not converse with White in the store that day, thereby casting additional doubt on White's version of events. Thus, although White testified at trial that he spoke with Tony, trial counsel already cast doubt on White's version of events regarding his presence at the store through both White's cross-examination and Mullen's uncle's testimony.

¶ 37    As to Lucas's affidavit, she averred she would have testified that she was never in a relationship with Ward and dated Mullen exclusively. However, as the circuit court noted, Lucas's affidavit does not establish whether Mullen believed that Lucas was cheating on him with Ward. Indeed, outside of White's testimony, we have no evidence of this supposed relationship at all. While Lucas's averment that there was no relationship with Ward may have potentially cast doubt on White's statements regarding Mullen's motive, it would not have undermined his identification

of Mullen as the shooter. Consequently, neither witness's testimony would have challenged the identification of Mullen as the offender nor probably led to a different result had trial counsel presented it.

¶ 38    Mullen contends that, had Samad and Lucas testified, a reasonable probability existed that the outcome of the trial would have been different because no physical evidence was presented, and the State's identification witnesses were incredible. Mullen notes that White, Mullen's accomplice, was the "linchpin" of the State's case, and the court relied on Awwad's and White's testimonies to establish the identification of Mullen as the shooter. Thus, Mullen concludes that his proffered evidence, which would have undermined White's credibility, would have altered the outcome of trial.

¶ 39    We disagree. In finding Mullen guilty, the trial court noted that White was self-serving in testifying but that did not necessarily mean he lied about the identity of the shooter. White's identification of Mullen was corroborated by Awwad's testimony. In denying his postconviction petition, the court commented that the guilty finding was based not only on Awwad's and White's identifications but also on the POD video and Minor's testimony, which corroborated White's testimony regarding the sequence of events. No evidence establishes that the court did not consider the deficiencies in White's testimony. Regardless, the totality of the evidence at trial established the identification of Mullen, and the new evidence—impeaching White's credibility as to whether he spoke with Samad and/or that Lucas was not cheating on Mullen—would not have altered the result of the proceeding. Thus, Mullen did not allege facts making a substantial showing that trial counsel was ineffective. See *Domagala*, 2013 IL 113688, ¶ 35.

¶ 40 Mullen next contends that postconviction counsel provided unreasonable assistance where he amended the *pro se* petition to include a claim of appellate counsel's ineffectiveness for failing to investigate Samad and Lucas, despite the claim being predicated on information outside of the trial record, specifically Samad's and Lucas's affidavits. Further, Mullen contends that in view of arguments raised in the State's motion to dismiss, postconviction counsel should have amended Mullen's affidavit to address "the veracity of White's claim that he and [Mullen] discussed the alleged cheating shortly before the shooting." Mullen further contends that postconviction counsel's Rule 651(c) certificate failed to raise a presumption of compliance with the rule because it did not specifically address that he had reviewed the trial exhibits.

¶ 41 The Act guarantees a postconviction petitioner "reasonable" assistance by counsel, which is "less than that afforded by the federal or state constitutions." (Internal quotation marks omitted.) *People v. Cotto*, 2016 IL 119006, ¶¶ 30, 45. To that end, Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) mandates certain duties postconviction counsel must undertake at the second stage of postconviction proceedings. Appointed counsel must consult with the defendant, examine the record of trial proceedings, make any necessary amendments to the petition, and file a certificate indicating they have complied with the rule. *Id.*; *Cotto*, 2016 IL 119006, ¶ 27.

¶ 42 The filing of a Rule 651(c) certificate creates a rebuttable presumption that postconviction counsel rendered reasonable assistance. *People v. Bass*, 2018 IL App (1st) 152650, ¶ 12. The defendant has the burden to overcome this presumption by showing their attorney's failure to substantially comply with the duties mandated by Rule 651(c). *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19.

¶ 43    We review *de novo* the question of whether postconviction counsel fulfilled his duties under Rule 651(c). *Profit*, 2012 IL App (1st) 101307, ¶ 17.

¶ 44    Here, postconviction counsel filed a Rule 651(c) certificate stating, in compliance with the rule, that he: (1) consulted with Mullen by mail and phone to ascertain his contentions of deprivations of constitutional rights; (2) "obtained and examined the record (report of proceedings and common law record) from [Mullen's] trial and reviewed the relevant case law related to [Mullen's] claims"; and (3) prepared a supplemental petition for postconviction relief. Thus, the presumption exists that Mullen received the representation required by the rule.

¶ 45    Mullen argues, however, that the presumption does not arise, as counsel's certificate failed to comply with Rule 651(c) by not specifically stating that he reviewed the trial exhibits. However, Rule 651(c) does not suggest "the certificate is intended to be a comprehensive recounting of all of postconviction counsel's efforts." *People v. Jones*, 2011 IL App (1st) 092529, ¶ 24. Further, "Rule 651(c) only requires postconviction counsel to examine as much of the record as is necessary to adequately present and support those constitutional claims raised by the [defendant]." (Internal quotation marks omitted). *People v. Collins*, 2021 IL App (1st) 170597, ¶ 34. Thus, although postconviction counsel did not specifically state that he reviewed the trial exhibits, he was under no obligation to recite all his efforts. See *Jones*, 2011 IL App (1st) 092529, ¶ 24. Further, nothing in the record suggests that postconviction counsel did not review the exhibits. Notably, the exhibits did not relate to Mullen's claims in his *pro se* and supplemental petitions because the affidavits of Samad and Lucas did not contradict the events of the shooting itself or the identity of the shooter. See *Collins*, 2021 IL App (1st) 170597, ¶ 34. Thus, because postconviction counsel filed an

adequate certificate under Rule 651(c), a rebuttable presumption exists that counsel provided reasonable assistance. *Bass*, 2018 IL App (1st) 152650, ¶ 12.

¶ 46    Mullen does not overcome that presumption. Mullen contends that the State's motion to dismiss argued that his *pro se* postconviction petition did not mention White's testimony that White and Mullen discussed Lucas's relationship with Ward prior to the shooting. Thus, according to Mullen, to properly present the claim that trial counsel was ineffective for not investigating Lucas, postconviction counsel needed to file an amended affidavit from Mullen refuting the alleged conversation between White and Mullen. We observe, however, that the *pro se* petition merely argued that trial counsel was ineffective for failing to call Lucas, who would have testified that she was not in a relationship with Ward. Because Mullen never raised a claim regarding White's conversation with Mullen about Lucas in his *pro se* and supplemental petitions, counsel was under no obligation to provide support for it. See *People v. Milam*, 2012 IL App (1st) 100832, ¶ 33 ("Under Rule 651(c) there is no requirement that postconviction counsel must amend a defendant's *pro se* petition or scour the record to uncover claims that were not raised by the defendant."). Thus, Mullen has not overcome the presumption that counsel substantially complied with Rule 651(c).

¶ 47    Last, Mullen contends postconviction counsel provided unreasonable assistance where, even though White and Lucas's affidavits were not included in the direct appeal record, postconviction counsel added an allegation that direct appellate counsel was ineffective for failing to allege that trial counsel was ineffective for failing to investigate Samad and Lucas.

¶ 48    Here, the ineffective assistance of trial counsel was not raised on direct appeal, and so could not be raised in a postconviction petition and was forfeited from review. See *People v. English*,

2013 IL 112890, ¶ 22 (In postconviction proceedings "issues that could have been raised on direct appeal, but were not, are forfeited."). In such situations, to circumvent the forfeiture, postconviction counsel may claim ineffective assistance of appellate counsel for failing to address the issue on appeal. See *id*.; *People v. Addison*, 2023 IL 127119, ¶ 23. Here, it is apparent that counsel included the allegation of ineffective assistance of appellate counsel out of an abundance of caution to avoid potential forfeiture of the ineffective assistance of trial counsel claim. We cannot say that postconviction counsel's choice to do so overcomes the presumption of reasonable assistance. Therefore, Mullen's claims asserting unreasonable assistance of postconviction counsel fail. See *Profit*, 2012 IL App (1st) 101307, ¶ 19.

¶ 49                                  III. CONLCUSION

¶ 50     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 51     Affirmed.